## Commonwealth v. Young

*Howard R. Berninger*, District Attorney, for Commonwealth.

*Gailey C. Keller*, for defendant.

KREISHER, P. J., March 20, 1959.—This is an appeal from a summary conviction before a justice of the peace upon an information filed by a member of the Pennsylvania State Police charging appellant with the unlawful operation of a Ford station wagon registered as a passenger vehicle because appellant salesman was transporting samples of his commodity, namely, canned vegetables, when stopped for a routine inspection by the officer.

The information was lodged as a violation of article IV, sec. 401, subsec. (*a*) of The Vehicle Code of May 1, 1929, P. L. 905, as amended, 75 PS §91, which provides:

"(a) Except as is hereinafter provided, no motor vehicle, trailer, or semi-trailer shall be operated upon any highway in this Commonwealth until such motor vehicle, trailer, or semi-trailer shall have been properly registered with the department, as hereinafter provided, and the registration plate or plates that have been issued for the vehicle for the current year are received and displayed as required by this act, and no motor vehicle shall be registered until a certificate of title has been obtained therefor."

Article I, sec. 102, of said code, 75 PS §2, provides inter alia, as follows:

" 'Commercial Motor Vehicle.'—Any motor vehicle designed for carrying freight or merchandise."

The Commonwealth relies upon an informal opinion from the Attorney General, which reads as follows:

"Station wagons are dually designed motor vehicles and is the only vehicle which the department registers according to its use. Our ruling is based on an informal opinion from the Attorney General which reads as follows:

"*Station Wagons*

"Used for commercial purposes, as well as that of hauling passengers, are properly classified as commercial motor vehicles. If used exclusively for hauling passengers, it shall be classified as a passenger motor vehicle. Luggage or baggage shall not be construed as commercial use or transportation of groceries, etc., by independent owner from store or market to residence of owner.

"Station wagons used by salesmen for the transportation of samples, by mechanics for the transportation of tools or equipment, by rural mail carriers for the transportation of mail and by business people for the transportation of radios, etc., must be registered in the commercial classification.

"Station wagons registered in the commercial class are restricted to truck speeds and are prohibited from operating through some of the parkways."

It is our understanding that the Secretary of Revenue has adopted the above quoted opinion as a regulation in the Bureau of Motor Vehicles and this regulation is the real basis of this prosecution.

The only case we find in Purdon's Annotations on this subject is Commonwealth v. Riter, 6 D. & C. 2d 697, wherein Dannehower, J., of Montgomery County, dismissed the appeal and adjudged defendant guilty of a violation of this section under similar circumstances.

On page 699 of the opinion it is stated:

". . . it is patently clear that the legislature sought to designate as 'Commercial' all motor vehicles which are peculiarly adapted for transporting freight and merchandise. It is common knowledge that a station wagon can very readily be converted into a vehicle which is suitable for carrying freight and merchandise and when so used is just as satisfactory as a light pick-up truck. Where an owner takes advantage of the vehicle's peculiar design so as to convert it into a carrier of merchandise and uses it in the normal course of events in furtherance of a commercial venture, then we have no hesitancy in deciding that such a vehicle should be placed under a commercial registration."

We have high regard for the skill and acumen of our friend, Judge Dannehower, but we regret that we cannot agree with him. He quoted the familiar principle of law which "requires the Court to strictly construe all penal statutes and resolve all ambiguities and uncertainties therein contained in a light most favorable to the accused," but then he proceeds to remove the ambiguity and uncertainty by resorting to the Statutory Construction Act of May 28, 1937, P. L. 1019, and in the process his result gives legal sanction

to a bureaucratic regulation which is gaining so much approval in our Federal jurisprudence. He recognizes the dilemma presented by a prosecution of this nature for the closing paragraph of his opinion reads as follows:

"We understand that the legislature is now considering an amendment to The Vehicle Code concerning the registration of station wagons, increasing the registration fee so that they may be used as a passenger as well as a commercial vehicle on the same registration plate."

Now, looking at the above quoted regulation, which incidentally has never been published so as to give the public due notice thereof, we are confronted first with the constitutional question of whether or not said regulation is a delegation of a legislative function in contravention of article II, sec. 1, of the Constitution of Pennsylvania, which provides:

"The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives."

It has been generally held under the above quoted sections of the Constitution that the legislature may delegate its legislative functions and confer discretion in the administration of the law, but it may not delegate purely legislative powers in the absence of such constitutional authorization, and it therefore follows that the legislative function to create or define offenses and prescribe the punishment thereof must be exclusively reserved to the legislature.

To declare what shall constitute crime and how it shall be punished is an exercise of the sovereign power of the State and is inherent in the legislative department of the government and, unless authorized by the Constitution, this power cannot be delegated by the legislature to any other agency.

The general criminal laws of the State are in force in every part thereof and apply to every resident and no power but that which enacted them can suspend, repeal or enlarge them.

In the case of the Santus Unemployment Compensation Case, 177 Pa. Superior Ct. 496, on pages 499 and 500 of the opinion it is stated:

"While the legislature cannot delegate the power to make a law, it may confer authority and discretion in connection with the execution of the law, that is, it may establish primary standards and impose upon others the duty of carrying out the declared legislative policy in accordance with the general provisions of the statute."

In the case of Commonwealth v. Harrison, 183 Pa. Superior Ct. 133, on page 140 of the opinion the following statement from the case of Kellerman v. Philadelphia, 139 Pa. Superior Ct. 569, is quoted with approval:

" 'The legislature constitutionally may refer to a person or body of persons, within limits, set by the terms, purpose, or policy of the enactment, or by recognized scientific findings in various fields, the independent determination of facts upon which the application or enforcement of the law is to depend. . . . But any legislative enactment which vests in a person or body of persons free of any standard independent of his or their own mind and judgment the power of supplying, or giving force to, or suspending its terms falls beyond the limits of judicial approval . . . and is unconstitutional as a delegation of the power reposed exclusively in the legislature.' "

In the case of Ruch v. Wilhelm, 352 Pa. 586, it is stated on page 592 that:

"Authority may be given to a government official or an administrative agency to make rules and regu-

lations to cover mere matters of detail for the implementation of a statute, but where the statute itself is lacking in essential substantive provisions the law does not permit a transfer of the power to supply them, for the legislature cannot delegate its power to make a law."

The legislature is well acquainted with the foregoing principles and The Vehicle Code reveals certain instances where the principle was applied.

Section 805 of article VIII of The Vehicle Code of May 1, 1929, P. L. 905, 75 PS §355, which relates to the type of lights to be used on a motor vehicle, authorizes the secretary to adopt and enforce rules and uniform standard specifications as to the amount, color and direction of light to be emitted by headlamps, which in our opinion is a proper delegation of the power to the secretary.

Likewise, section 1012 of article X of the code, 75 PS §571, which relates to signals to be given on starting, stopping and turning, authorizes the secretary to make rules and regulations not inconsistent with the code for the efficient administration of this section, which is in our opinion a proper authorization.

Section 1103, article XI, of the code, 75 PS §663, delegates power to local authorities to make certain rules and regulations not inconsistent with the code for the control of traffic within their respective municipalities, and section 1106 of article XI, 75 PS §682, directs that in the event local authorities exercise the power to make local rules and regulations, the same must be duly posted and advertised so as to give the public due notice of those local ordinances, rules and regulations.

Nowhere else in the code do we find any delegation of power by the legislature. Therefore we need not consider the question of whether the regulation above

quoted and adopted by the secretary in regard to station wagons is a valid delegation of power because the legislature failed to provide for any such authorization, and it would seem to follow that in the absence of any such provision, the same cannot be implied by inferences, or on the grounds that it is within the general intent of the code.

Since this power was not specifically so authorized by the legislature, we are convinced the secretary has no authority to make the regulation here invoked.

It goes without saying that when such authority is delegated by the legislature any rule or regulation made in pursuance thereof must not only be a reasonable one intended to carry out the purpose of the act, but it must also be duly advertised or posted so that the parties affected thereby may have due notice thereof.

In the present case, it was not only difficult for the court to obtain this regulation, but in addition thereto, applying the rule of common sense and reasonableness to it, it strikes us as being not only unreasonable, but absurd and almost impossible of effective enforcement.

Furthermore, this court does not believe that it is constitutionally legal to endeavor to use a penal provision of an enacted statute for the punishment of the violation of a rule or regulation not authorized by the statute.

From the foregoing it is evident that if the legislature intended station wagons to have a dual personality and be subjected to various licensing provisions, the legislature would have said so because station wagons have been in vogue and general use during many sessions of the legislature and this rule or regulation was not enforced with any great vigilance until after the filing of the above cited Montgomery County case.

Now, looking at subsection (a) of section 401 of The Vehicle Code above quoted, we find it provided that no motor vehicle shall be operated upon the highway until such motor vehicle shall have been properly registered, and the definition above quoted from the code states a commercial vehicle to be one designed for carrying freight or merchandise.

There is not a word in the act about "station wagons" or "dually designed motor vehicles", nor does the act anywhere state that a motor vehicle shall be registered according to its use, and the act fails to establish any standards or impose upon the secretary the duty of carrying out the declared legislative policy in accordance with the general provisions of the statute.

Examining the beautifully upholstered station wagons of today, it is absurd to our way of thinking that they are designed for carrying freight or merchandise. Judge Dannehower states: "It is common knowledge that a station wagon can very readily be converted into a vehicle which is suitable for carrying freight or merchandise".

What prevents this statement from applying with equal force to a Cadillac sedan which boasts of a trunk "big enough to fly a kite?"

It is not uncommon to see salesmen have the entire rear portion of their sedan loaded with samples and merchandise, and we understand this is perfectly proper and not considered to be a violation of the above mentioned section of the code. Where is the line of demarcation in the bureau's regulation and how can such a rule or regulation create a crime without legislative sanction?

In the present case, appellant was hauling a partial case of canned vegetables and when he would call upon prospective customers he would open a can or two to exhibit their contents in order to help him make a sale,

but supposing he had been a jewelry salesman with a diamond on the floor, even so, under the Riter case, it would be a violation.

Now let us look at the unfortunate results that the strict enforcement of this regulation would bring about, and incidentally, in passing, the regulation as it now stands is most impractical from an enforcement standpoint. But consider the salesman or rural mail carrier that is the head of a family with a number of children and naturally can afford but one car. He decides upon the purchase of a station wagon for reasons of economy, utility, convenience and necessity. He uses it in his business and as the family car.

The regulation requires a commercial license since he uses it in his business. Therefore, when he takes his family on a vacation or a trip, he is restricted to truck speeds and truck routes because of his commercial plates.

The regulation admits this absurd fact because it states:

"Station wagons registered in the commercial class are restricted to truck speeds and are prohibited from operating through some of the parkways."

We conclude this is a legislative problem and until the legislature, which is presently in session, chooses to enact some clear and definite legislation on the matter, this court will at least register its reluctance to criminally enforce a bureaucratic regulation, which, in our opinion, is not authorized by The Vehicle Code.

Our adjoining States have solved this problem very simply by making a station wagon classification and issuing a station wagon license, and even though this type of vehicle is certainly not new upon the market, our legislature has failed to so legislate.

As we see it, appellant did not violate the section of the code he is alleged to have violated because when he applied for his registration plates, he did so on a de-

partment form, his type of vehicle was clearly stated and he was issued a license to operate that vehicle, so how can we hold he operated upon the highway without having his vehicle properly registered with the department?

Our final observation, among the many others that come to mind, relates to the statement in the Riter opinion that the results therein reached necessarily follow from "the spirit and obvious intent of the statute", and therefore, it is reasonable for the court to read into the statute something that is not contained therein.

With due apologies to our learned friend, Judge Dannehower, we think it is more reasonable and logical to arrive at the opposite conclusion when due consideration is given to "necessity for the law, the mischief to be remedied and the object to be attained".

In the exercise of the police power, the legislature established two classes of motor vehicles and fixed the registration fees for each class. The fee for all classes of passenger vehicles is fixed at $10. But commercial vehicles are divided into eight classes with an additional 10 classes being added after January 1, 1957, and all of these 18 classes are redivided into innumerable classes and fees dependent upon the type of tires, the number of axles and the maximum gross weight to be carried, ranging from two axles with a maximum gross weight of 5,000 pounds at a fee of $16.50 per year to four axles in pairs with a maximum gross weight of 60,000 pounds at an annual fee of $360. The Vehicle Code of May 1, 1929, P. L. 905, art. VII, sec. 703, as amended, 75 PS §272.

These various classifications and respective fees have been held well within the police power in the interest of public safety and for the protection of our highways and bridges because it is common knowledge the greater the load, the greater the damage.

However, this same logic does not apply to a station wagon because it is not built or designed to carry any load near the smallest classification of 5,000 pounds. It simply must follow then in regard to station wagons that the necessity for the law, the mischief to be remedied and the object to be attained, does not indicate a legislative intent to include a station wagon within the commercial vehicle classification, irrespective of the use being made of the vehicle by its owner.

To say a station wagon can be "converted into just as satisfactory a commercial vehicle as a light pick-up truck", and therefore must have a truck license, is begging the question and creating a judicial crime without legislative authority. A truck is a truck built and designed with springs, tires, motor, chassis and body for the transportation of heavy loads of freight and merchandise. A station wagon is not a truck in any sense of the term in appearance, design or construction.

To call my next door neighbor's new snowy white Lark station wagon with its white leather upholstered seats a truck would be adding insult to injury.

To try and convince my hunting attorney friend that his new nine-seat Chrysler Imperial we use on hunting trips is a truck would be utter folly and futile.

Therefore if station wagons are to be taken out of the passenger classification, let the legislature so direct, but until that time we do not think the bureau, the police or the courts are authorized to do so, no matter what use is being made of the station wagon by its owner.

Without continuing this already too lengthy opinion with further illustrations and examples of what to us seems pure reason and logic, we have no difficulty in concluding that the appeal must be sustained, and to this end, we make the following

660

### Order

And now, to wit, March 20, 1959, the appeal is sustained, defendant is adjudged not guilty and the costs are placed upon the County of Columbia.